# In the United States Court of Appeals
# For the Eighth Circuit

UNITED STATES OF AMERICA,

APPELLEE,

V.

MUHAMMAD MASOOD,

APPELLANT.

*Appeal from the
United States District Court for the
District of Minnesota*

## BRIEF OF APPELLEE

ANDREW M. LUGER
    *United States Attorney*

DAVID M. GENRICH
    *Assistant U.S. Attorney*

*U.S. Attorney's Office
District of Minnesota
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600*

Attorneys for Appellee

## SUMMARY OF THE CASE

After contemplating "lone wolf" terrorist acts within the United States, Muhammed Masood attempted to join the Islamic State of Iraq and al-Sham ("ISIS") on Syrian battlefields. He volunteered to fight for ISIS, to weaponize drones for lethal attacks, and to be a combat medic for its soldiers. As he carefully planned his ISIS-inspired travel to Syria, he discussed his extremist views with an individual who was working as an FBI source. Law enforcement arrested Masood at the Minneapolis-St. Paul airport as he set out for the Middle East. A grand jury then indicted him for attempting to provide material support to a designated foreign terrorist organization. After pleading guilty, the district court sentenced him to 216 months' imprisonment, a downward variance.

Masood alleges that the district court committed three procedural sentencing errors, challenges the substantive reasonableness of the sentence, and claims that the district court did not afford him meaningful allocution. If the Court determines oral argument would be helpful, the government respectfully suggests 10 minutes is sufficient.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ..................................................................... i

TABLE OF AUTHORITIES ................................................................. v

STATEMENT OF THE ISSUES ......................................................... 1

STATEMENT OF THE CASE ............................................................ 2

I.    Factual Background ................................................................. 2

    A.    Masood Comes to the United States. ................................. 2
    B.    Masood Becomes Radicalized and Resolves to Fight for ISIS in Syria. ......................................................... 3
    C.    Masood Carefully Plans Travel To Syria. ......................... 9
    D.    Masood's Makes Final Preparations, Embarks On His Intended Travel, And Is Arrested ............................. 12

II.   Procedural History ................................................................. 14

    A.    Indictment ......................................................................... 14
    B.    Competency Examination and Restoration ..................... 14
    C.    Plea .................................................................................... 15
    D.    Presentence Investigation Report .................................... 15
    E.    The Parties' Sentencing Position Pleadings ................... 17
        1.    The    Government's    Opening    Sentencing Pleading ................................................................... 17
        2.    Masood's Opening Sentencing Pleading ................. 20
        3.    The Parties' Sentencing Replies ............................ 22

    F.    Sentencing Hearing .......................................................... 22

SUMMARY OF THE ARGUMENT .................................................... 34

ARGUMENT ..................................................................................... 36

I.    The District Court Did Not Procedurally Error In Applying The Terrorism Adjustment, Considering the § 3553(a) Factors, Or Explaining Its Sentence. ...................................... 36

A.    The District Court Committed No Clear Error In Applying The Terrorism Adjustment. ............................ 36

    1.    Standard Of Review ............................................... 36

    2.    The § 3A1.4 Terrorism Adjustment ....................... 37

    3.    The District Court Committed No Clear Error In Finding That Masood's Offense Involved A Federal Crime Of Terrorism. ................................... 38

    4.    In The Alternative, The District Court Committed No Clear Error in Finding That Masood's Offense Was Intended To Promote A Federal Crime Of Terrorism. ................................. 50

B.    The District Court Did Not Err, Much Less Plainly So, In Considering The § 3553(a) Factors. ....................... 52

    1.    Standard Of Review And Legal Standards............. 52

    2.    The District Court Considered The § 3553(a) Factors. .................................................................. 53

C.    The District Court Did Not Err, Much Less Plainly So, In Explaining Its Sentence. ........................................ 56

    1.    Standard of Review ................................................ 56

    2.    The District Court Adequately Explained Its Sentence. ................................................................ 58

II.    The District Court Did Not Abuse Its Discretion By Sentencing Masood to 216 Months' Imprisonment................... 61

A.    Standard Of Review......................................................... 61

B.    The District Court Did Not Abuse Its Sentencing Discretion. ....................................................................... 63

III.    The District Court Did Not Violate Masood's Rule 32(i) Or Due Process Rights At Sentencing. .......................................... 67

A.    Standard Of Review......................................................... 67

B.    The District Court Did Not Err, Plainly Or Otherwise. ....................................................................... 67

CONCLUSION................................................................................... 72

CERTIFICATE OF COMPLIANCE ..................................................... 73

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007).....................................63, 66

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010)...........19

*United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020) .................47

*United States v. Ali*, 799 F.3d 1008 (8th Cir. 2015) .....................36, 41

*United States v. Ansberry*, 976 F.3d 1108 (10th Cir. 2020) .........47, 48

*United States v. Anwar*, 880 F.3d 958 (8th Cir. 2018).......................63

*United States v. Awan*, 607 F. 3d 306 (2d Cir. 2010).............50, 51, 52

*United States v. Avery*, 807 F. App'x 74 (2d Cir. 2020).....................71

*United States v. Barbee*, 44 F.4th 1152 (8th Cir. 2022) ....................55

*United States v. Barrett*, 552 F.3d 724  (8th Cir. 2009)...............67, 70

*United States v. Benitez*, 409 F. App'x 38 (8th Cir. 2010)............54, 59

*United States v. Black*, 670 F.3d 877 (8th Cir. 2012)........................58

*United States v. Boen*, 59 F.4th 983 (8th Cir. 2023) ...................36, 37

*United States v. Bolden*, 596 F.3d 976 (8th Cir. 2010) .....................62

*United States v. Bonnell*, 932 F.3d 1080 (8th Cir. 2019) ..................61

*United States v. Boose*, 403 F.3d 1016 (8th Cir. 2005)......................70

*United States v. Burns*, 834 F.3d 887 (8th Cir. 2016)........................61

*United States v. Chavarria-Ortiz*, 828 F.3d 668 (8th Cir. 2016) . 58, 61

*United States v. DeMarrias*, 895 F.3d 570 (8th Cir. 2018) .......... 57, 66

*United States v. Dowty*, 37 F.4th 489 (8th Cir. 2022) ....................... 37

*United States v. Feemster*, 572 F.3d 455 (8th Cir. 2009) ................. 62

*United States v. Gray*, 533 F.3d 942 (8th Cir. 2008).................... 53, 54

*United States v. Greenwell*, 483 F. App'x 305 (8th Cir. 2012) ........... 54

*United States v. Hall*, 825 F.3d 373 (8th Cir. 2016)........................... 62

*United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014)............... 44, 45

*United States v. Hentges*, 817 F.3d 1067 (8th Cir. 2016)....... 67, 68, 70

*United States v. Hernandez-Espinoza*, 890 F.3d 743 (8th Cir. 2018)

....................................................................................... 67, 68, 70

*United States v. Hoffman*, 707 F.3d 929 (8th Cir. 2013) ............. 67, 69

*United States v. Holmes*, 87 F.4th 910 (8th Cir. 2023) ..................... 56

*United States v. Isler*, 983 F.3d 335 (8th Cir. 2020).......................... 36

*United States v. Johnson*, 619 F.3d 910 (8th Cir. 2010) .................. 57

*United States v. Jones*, 701 F.3d 327 (8th Cir. 2012)........................ 62

*United States v. Jumaev.*, 2018 WL 3490886 (D. Colo. 2018) ........... 48

*United States v. Keating*, 579 F.3d 891 (8th Cir. 2009) .................... 66

*United States v. Khweis*, 2023 WL 4993685 (11th Cir. Aug. 4, 2023)

............................................................................................42

*United States v. Lazarski*, 560 F. 3d 731 (8th Cir. 2009)..................63

*United States v. McGlothen*, 556 F.3d 698 (8th Cir. 2009) ...............52

*United States v. Mees*, 640 F.3d 849 (8th Cir. 2011)..........................57

*United States v. Palkowitsch*, 36 F.4th 796 (8th Cir. 2022).........57, 61

*United States v. Perkins*, 526 F.3d 1107 (8th Cir. 2008)..............53, 56

*United States v. Puckett*, 715 F. App'x 578 (8th Cir. 2018)..........67, 70

*United States v. Ramirez*, 16 F.4th 844 (11th Cir. 2021)............47, 48

*United States v. Robinson*, 516 F.3d 716 (8th Cir. 2008)..................57

*United States v. Skog*, 820 F. App'x 494 (8th Cir. 2020)..................62

*United States v. Slinkard*, 61 F.4th 1290 (10th Cir. 2023)...............71

*United States v. Soliz*, 857 F.3d 781 (8th Cir. 2017)..........................65

*United States v. Soto*, 779 F.3d 525 (8th Cir. 2015).....................67, 69

*United States v. Thurmond*, 914 F.3d 612 (8th Cir. 2019) ...............67

*United States v. Torres-Ojeda*, 829 F.3d 1027 (8th Cir. 2016)...........57

*United States v. Waller*, 689 F.3d 947 (8th Cir. 2012) .......................37

*United States v. Wilcox*, 666 F.3d 1154 (8th Cir. 2012) ..............65, 66

*United States v. Wisecarver*, 911 F.3d 554 (8th Cir. 2018) ...............62

*United States v. Wright*, 747 F.3d 399 (6th Cir. 2014)....................... 46

**Statutes**

Title 18, United States Code, Section 956(a)................................50

Title 18, United States Code, Section 2332b(g)(5) ....................... 16, 37

Title 18, United States Code, Section 2332b(g)(5)(A).....................17

Title 18, United States Code, Section 2332b(g)(5)(B)(i)....................39

Title 18, United States Code, Section 2339B .............................. 38, 40

Title 18, United States Code, Section 2339B(a)(1) ...........................14

Title 18, United States Code, Section 3553(a) .......................... *passim*

**Other Authorities**

Federal Rule of Criminal Procedure 32(i)....................35, 67, 70, 71

Federal Rule of Criminal Procedure 32(i)(1)(C) ........................68, 69

Federal Rule of Criminal Procedure 32(i)(4)(A) ............................69

United States Sentencing Guidelines, Section 3A1.4............... *passim*

United States Sentencing Guidelines, Section 3A1.4(b).................16

United States Sentencing Guidelines, Section 4A1.3 .......................20

United States Sentencing Guidelines, Section 5H1.3................. 20, 26

United States Sentencing Guidelines, Section 5K2.0.......................26

United States Sentencing Guidelines, Section 5K2.13......................20

United States Sentencing Guidelines, Section 5K2.20......................20

## STATEMENT OF THE ISSUES

I.    Did the district court commit procedural sentencing error when it made well-supported factual findings in applying the terrorism adjustment, appropriately considered the § 3553(a) sentencing factors, and adequately explained its sentence?

*United States v. Palkowitsch*, 36 F.4th 796 (8th Cir. 2022)
*United States v. Ali*, 799 F.3d 1008 (8th Cir. 2015)
*United States v. Perkins*, 526 F.3d 1107 (8th Cir. 2008)

II.   Did the district court abuse its discretion by imposing a 216-month term of imprisonment, a downward variance from the 240-month guidelines range, when Masood attempted to support ISIS, a brutal terrorist organization, on its Syrian frontlines?

*United States v. Lazarski*, 560 F. 3d 731 (8th Cir. 2009)

III.  Did the district court violate Masood's procedural rights by affording him an opportunity to argue his guidelines objections and to allocute as provided for in Federal Rule of Criminal Procedure 32(i)?

*United States v. Hentges*, 817 F.3d 1067 (8th Cir. 2016)

**STATEMENT OF THE CASE**

# I. Factual Background

## A. Masood Comes to the United States.

Masood, a Pakistani national, was a licensed physician in Islamabad, Pakistan. (PSR ¶¶ 55, 90, 93, 97.) In early 2018, he traveled to the United States on a non-immigrant visa sponsored by the Mayo Clinic in Rochester, Minnesota. (PSR ¶ 63.) Masood worked as a medical researcher there while studying for the foreign medical licensing exam. (PSR ¶¶ 63, 96.)

Within a year's time, Masood encountered professional and personal setbacks. In June 2018, he failed the foreign medical licensing exam. (*Id.*) Around the same time, he met a United States citizen online through a matrimonial website. (PSR ¶ 64.) They married in August 2018, but divorced less than a year later. (*Id.*) Masood's ex-wife discovered that he had lied to her about passing his foreign medical licensing exam. (*Id.*) She also became concerned that he had married her to obtain permanent residency status in the United States, and she witnessed signs of depression in Masood. (*Id.*) Masood's religious beliefs caused him to reject prescription

2

medication, to encourage his ex-wife to wear a traditional Muslim face covering ("*niqab*"), and to become upset if she did not pray on schedule. (*Id.*)

**B.      Masood Becomes Radicalized and Resolves to Fight for ISIS in Syria.**

As Masood's medical career floundered and his marriage dissolved, Masood turned to extremism and became deeply disaffected with the United States. In 2019, Masood began watching videos posted by radicalized Islamicists in what he described as a search for the "truth." (PSR ¶¶ 18, 28.) He listened to lectures of Anwar Al-Awlaki, an extremist imam and al-Qaeda leader who was killed by the United States military. (PSR ¶¶ 16, 28.) It was through Al-Awlaki's lectures, Masood later explained, that he decided that ISIS was "where the truth was." (PSR ¶ 16.)

Masood's "truth" included distain for the United States and its targeting of ISIS. (PSR ¶¶ 9, 16.) Masood had "seen how the *kuffar* [those who do not support extreme Islamic ideologies] are after coming to the United States and now understands them better." (*Id.*) Struggling to hide his contempt, he "hate[d] smiling at the passing *kuffar* just to not make them suspicious" and could not "tolerate it

anymore." (PSR ¶ 9.) He believed that "if you want to learn the *haqq* [the truth] you have to see which direction the *kuffar*'s arrows are pointing." (PSR ¶ 16.) "[S]o," Masood observed, "that's how I found *dawla* [ISIS]." (*Id.*)

In support of ISIS, Masood first considered launching "lone wolf" attacks from inside the United States. (PSR ¶ 14.) He saw opportunities to strike while "behind enemy lines" because he was already in-country while extremists abroad could not "reach here to attack." (PSR ¶ 9.) "There is so much I wanted to do here," he confided to a FBI confidential human source ("CHS-1"). (PSR ¶ 14.) "Lon wulf (sic) stuff, you know." (*Id.*) He wondered whether he would regret not "attacking the enemy when I was in the middle of it." (PSR ¶ 9.)

Masood decided, however, that he wanted to join ISIS on the frontlines in Syria. He was certain he "belong[ed] on the frontline and not anywhere else." (PSR ¶ 8.) He insisted that "[y]ou have to do your *jihad* always... because if you don't do *jihad* and don't have intention to do *jihad* then you die on a branch of *nifaq* [hypocrisy of true Muslim faith]." (PSR ¶12.) In Syria, he would be "part of the army that meets

the Rum al Dabiq or Amaq [a battle that precipitates the end of modern times]." (*Id.*)

Once in Syria, Masood intended to receive weapons training, help coordinate drone attacks, and kill on behalf of ISIS. (PSR ¶¶ 11-13; R. Doc. 110, at 6-9.) He wrote the CHS-1 about needing weapons training when he joined ISIS and enthusiastically offered to help modify drones into *istishhadi* (martyrdom) weapons. (R. Doc. 110, at 6-9; PSR ¶¶ 11-12.) Masood suggested forming a "team of trusted brothers" that could assist him in weaponizing drones that could be used "almost like flying grenades." (R. Doc. 110, at 7-8; PSR ¶¶ 11-12.) "Even in America," Masood assured, "police will not know if you hit a moving train with a drome [sic] storm" because "they will not know exactly where the drone is being controlled from" if "you leave immediately." (R. Doc. 110, at 8.) He also outlined the coordinated use of drones to attack enemy compounds:



you send one drone with a bigger capacity...that can hold more gas/fuel and have it spray and compound building ceiling and have it return back because it would be expensive and not to be destroyed ...then you can use a smaller ones to set fire on the whole compound..without enemy even realizing if they are all inside
9:29 PM

(*Id.* at 8.) Masood explained that he had seen such drones used by "*dawla*" (ISIS) in videos he had watched:

are you talking about the one used by dawla or the ones US uses? 8:42 PM

I was talking about the one used by dawla 8:42 PM ✓✓

They use them in Iraq a lot 8:42 PM ✓✓

yeah i saw in some videos 8:43 PM

(*Id.* at 7 (Masood's words appear in white while CHS-1's appear in yellow).) And when CHS-1 asked Masood about killing people on behalf of ISIS, Masood committed "to kill and get killed... and kill and get killed." (PSR ¶ 13.) "This," Masood explained, "is what even *rasool Allah saas* [the messenger of Allah] wished." (*Id.*)

Masood consumed ISIS propaganda that celebrated its armed aggression against governments aligned against it. On a thumb drive

recovered from Masood upon his arrest, for example, federal law enforcement discovered over 900 deleted images of ISIS-related or Islamic extremist propaganda. (PSR ¶ 25.) Among the images was an "infographic" entitled "Harvest of the Soldiers." (R. Doc. 110, at 17.) It lauded attacks by ISIS on governmental forces opposed to it, superimposing body counts over the flags of Syria, Great Britain, and the United States, among others:



(*Id.*) Other photographs showed ISIS committing grisly executions and a cache of assault weapons:






(*Id.* at 16-17.)

As his plan to join ISIS advanced, Masood met online with a second CHS, who Masood believed was an ISIS commander located in a foreign country. (PSR ¶¶ 15-17.) In February 2020, Masood drove 90 minutes from Rochester to a Bloomington hotel to be vetted, he believed, for membership in ISIS.



FEB 19 2020 16:21:26

(R. Doc. 110, at 9 (screen-capture from the meeting); PSR ¶¶ 15-17.) Masood explained his decision to join ISIS, recounting the lectures of Anwar al-Awlaki and his embrace of ISIS as a target of the *kuffar*'s arrows. (PSR ¶ 16.) He confirmed he wanted to go to Syria because there he could be a "combat medic" and "also fight." (*Id.*) At the close of the meeting, Masood pledged an oath of allegiance in Arabic to ISIS. (PSR ¶ 17.)

### C. Masood Carefully Plans Travel To Syria.

Radicalized and highly motivated, Masood began planning travel to Syria to provide material support to ISIS. (PSR ¶ 7.) He used an encrypted social media platform to request help with traveling to ISIS-controlled territory in Syria. (PSR ¶¶ 7-8; Plea Tr. 18.) Masood did not know, however, that the person who responded to him on the platform was CHS-1, employed by the FBI. (PSR ¶ 7.) For the next two

months, he communicated with CHS-1, seeking his help in getting to ISIS-controlled territory to join the fight. (PSR ¶¶ 7-22.)

Masood was acutely aware that his intended support of ISIS would be viewed by the United States government as against its interests. He suggested tactics he could use to prevent arousing suspicion from authorities. (PSR ¶¶ 9, 17.) After shared information with others from an Al-Awlaki video, Masood was worried he was on a "watchlist":

> i dont know...i am just thinking like that because it is not typical of me to go up to the cities that often...but i shared one day a video by anwar al awlaki to my brother on whatsapp group...so i think that after i did that i must be on some sort of watch list etc. its just my perception...may Allah protect us ameen
>
> 7:53 PM

(R. Doc. 110, at 22.) He accordingly requested from CHS-1 a fake visa to keep his identity "clean" for future travel after joining ISIS. (PSR ¶ 17.) To evade detection, Masood read counter-surveillance tactics recommended by *al Qaeda*, another terrorist organization:

> i read in a book...it was by al qaeda though...to know how to spot if someone is following you or not
>
> 7:49 PM

(R. Doc. 110, at 13.) Masood's concern about being followed or caught by the government was exacerbated by the ISIS propaganda he consumed. One of the deleted images from his thumb-drive was an "infographic" providing warnings and advice to "the supporters of the mujahidin" about the methods that intelligence agencies ("the enemies of Allah") used to intercept jihadists:



(R. Doc. 110, at 12.)

### D. Masood's Makes Final Preparations, Embarks On His Intended Travel, And Is Arrested.

In February and March 2020, Masood made final preparations to join ISIS in Syria. (PSR ¶¶ 18-23.) He resigned his research position at the medical clinic, gave notice to his landlord that he would be vacating his apartment, and listed his household items for sale on an internet marketplace. (PSR ¶¶ 18-19.) He bought a train ticket that would take him to Chicago and a ticket for air travel from Chicago to Amman, Jordan. (PSR ¶ 19.) When Jordan closed its borders due to the COVID pandemic, Masood agreed instead to board a cargo ship that would take him from Los Angeles to ISIS-controlled territory. (PSR ¶ 22.) In conversations with CHS-1, Masood reiterated that he wanted to go to "*AshSham*" (Syria) and that he was willing to accept the risk of illegal travel on a cargo ship. (*Id.*)

On March 16, 2020, Masood purchased an airline ticket for travel from Minneapolis to Los Angeles with a scheduled departure of March 19, 2020. (*Id.*) On March 19, he took a shuttle bus from Rochester, Minnesota, to the Minneapolis/St. Paul International Airport to catch his flight to Los Angeles. (PSR ¶ 23.) FBI agents arrested him after he proceeded through the airport security checkpoint. (*Id.*)

In a search of Masood's luggage, agents found items further evincing his plan to become a soldier and a combat medic for ISIS. (PSR ¶ 24.) He had, for example, packed a black balaclava, tactical vest, ammunition pouches, black military fatigues:



(R. Doc. 110, at 14.) Masood packed an extraordinary number of electronic devices, including seven laptop/notebook computers and multiple thumb drives and other electronic storage devices. (PSR ¶ 24; R. Doc. 110, at 15.) Ten days before his travel, Masood stated he planned to bring laptops with him that could be used for "ops stuff." R. Doc. 110, at 9 (citing R. Doc. 1-1, at ¶ 39 (Complaint Affidavit)).) Consistent with his stated desire to be a "combat medic," he also brought medical supplies and scrubs in his luggage. (PSR ¶ 24.)

Agents also found Masood's handwritten notes discarded in an airport trash can. (PSR ¶ 15 & Addendum at A.3.) Masood's notes referenced assault rifle ammunition, .107-caliber rockets, machine

guns, body armor, plastic explosives, and illumination rounds. (PSR Addendum at A.3.)

## II.    Procedural History

### A.    Indictment

In May 2020, Masood was charged by indictment with attempting to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). (R. Doc. 20.)[1] The matter was assigned to the Honorable Paul A. Magnuson.

### B.    Competency Examination and Restoration

In September 2020, Masood moved for and was granted a competency evaluation. (R. Doc. 33 (Motion); R. Doc. 36 (Order).)  In March 2021, Masood was diagnosed with psychotic and depressive disorders pursuant to the court-ordered evaluation. (PSR ¶ 81; R. Doc. 41 (report of evaluation).) Following a competency hearing, the district court issued an Order finding Masood not competent to proceed to trial and committed him to the care of the Bureau of Prisons for restoration of competency. (R. Doc. 143, at 5-6 (competency hearing transcript); R.

---

[1] In May 2014, the U.S. Secretary of State to added ISIS to its foreign terrorist organization listing. ISIS has remained a designated foreign terrorist organization since that date. (PSR ¶ 6.)

Doc. 46 (Order).) In December 2021, Masood was reevaluated after participating in treatment and being prescribed medications. (PSR ¶¶ 82-84.) Masood was diagnosed with depression and personality disorders, had no active symptoms, and was assessed competent to participate in court proceedings. (PSR ¶ 83; R. Doc. 53 (report of evaluation).) Masood was returned to district court, and in June 2022, the district court found Masood competent to proceed without objection from either party. (R. Doc. 141 (competency hearing transcript); R. Doc. 65 (Order).)

**C.  Plea**

In August 2022, Masood pleaded guilty to attempting to provide material support to ISIS as charged in the Indictment. (R. Doc. 72 (Minute Entry); Plea Tr. 10.) Masood entered a straight plea without a plea agreement. (Plea Tr. 4-23.)

**D.  Presentence Investigation Report**

In calculating the guidelines range prior to sentencing, the United States Probation Office recommended a base offense level of 26. (PSR ¶ 34.) The Probation Office recommended application of a 12-level upward adjustment under § 3A1.4 because Masood's offense of conviction was intended to promote a federal crime of terrorism as

defined in 18 U.S.C. § 2332b(g)(5). (PSR ¶ 36; U.S.S.G. 3A1.4(a).) After applying a three-level reduction for acceptance of responsibility, the Probation Office arrived at a total offense level of 35. (PSR ¶¶ 34-43.) Having committed an offense involving a federal crime of terrorism, Masood's criminal history category was enhanced from category I to category VI. (PSR ¶ 49; U.S.S.G. § 3A1.4(b).)

The Probation Office's calculations resulted in a guidelines range of 292 to 365 months' imprisonment. (PSR at ¶ 105.) However, because the statutory maximum for the offense of conviction is 20 years, the guidelines term of imprisonment was adjusted downward to 240 months. (PSR ¶¶ 104-05.)

The government had no objections to the PSR. (PSR Addendum at A.1.) Masood noted several objections. (PSR Addendum at A.1 – A.10.) Pertinent to this appeal, he objected to application of the 12-level terrorism adjustment. (PSR Addendum at A-4 to A-5.) Specifically, he argued that his offense did not involve, and was not intended to promote, a federal crime of terrorism as defined at § 2332b(g)(5). Section 2332b(g)(5) defines federal crimes of terrorism to require, in part, that the offense "is calculated to influence or affect

the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2232b(g)(5)(A). Masood claimed that he intended his "primary role" in support of ISIS to be the provision of medical care rather than influencing the conduct of or retaliating against a government. (PSR Addendum at A.4.) He disputed the Category VI criminal history classification on the same ground. (PSR Addendum at A.5.)

### E.    The Parties' Sentencing Position Pleadings

#### 1.    The Government's Opening Sentencing Pleading

The government began by reviewing in detail the facts and circumstances, described in the Factual Background section above, that surrounded Masood's radicalization and attempt to provide material support to ISIS. (R. Doc. 110, at 2-18.) The government then confirmed its support for the Probation Office's recommended guidelines calculations. (R. Doc. 110, at 18-22.) With respect to the § 3A1.4 terrorism adjustment, the government cited Masood's admissions that he offered to join ISIS knowing that it was a foreign terrorist organization engaged in terrorist activities; that he contemplated attacks "behind enemy lines" in the United States; and

that he offered to "kill and get killed" on the front lines for ISIS. (R. Doc. 110, at 21.) The government also noted that he volunteered to assist in the making of attack drones, swore an oath of allegiance to ISIS, stated he wanted to be a jihadist in an ISIS army that fights an end-of-days war in Syria, and packed military gear. (R. Doc. 110, at 21-22.) In combination with his other offense conduct, the government submitted that the evidence "overwhelmingly proves that his offense was calculated to influence the conduct of government." (R. Doc. 110, at 2-17, 22.)

The government recommended a 240-month sentence. (R. Doc. 110, at 1, 22-26.) In support of its recommended sentence, the government reviewed § 3553(a) sentencing factors, beginning with the nature and circumstances of the offense. (R. Doc. 110, at 2-17, 23.) Masood sought to assist a notoriously brutal organization that is one of the world's "most dangerous and violent" terrorist enterprises. (R. Doc. 110, at 23.) Contemplating attacks in the United States and committed to fighting for ISIS abroad, Masood posed a significant national security threat to the United States. (R. Doc. 110, at 23.) Addressing Masood's history and characteristics, the government

noted that Masood's conduct was not the product of "a single, impulsive or rash act." (R. Doc. 110, at 24.) Rather, his offense "involved multiple steps and detailed preparation over the course of months." (R. Doc. 110, at 24.) Rejecting Masood's claim to Probation that "he did not understand the severity of what he got himself involved in," the government argued that Masood "absolutely understood the severity of his crime" and "had multiple opportunities to abandon his efforts." (R. Doc. 110, at 24-25; PSR ¶ 30.)

Finally, the government turned to other § 3553(a) factors, namely considerations of deterrence, respect for the law, and just punishment. (R. Doc. 110, at 25.) A significant sentence was warranted for individual and general deterrence. (R. Doc. 110, at 25.) The government noted that combatting terrorism is "'an urgent objective of the highest order'" and that material support for terrorist organizations "'frees up other resources within the organization that may be put to violent ends,'" "'helps lend legitimacy to foreign terrorist groups,'" and may "'facilitate more terrorist attacks.'" (R. Doc. 110, at 25 (quoting *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2724, 2725 (2010)).)

## 2. Masood's Opening Sentencing Pleading

In his opening position pleading, Masood reiterated his objection to the 12-level terrorism adjustment and to the Category VI criminal history classification. (R. Doc. 111, at 4-7.) Masood again asserted his "primary purpose" was to provide medical care and contended that his "statements about his willingness to fight were intended on his part to show his commitment so that he would be accepted. (R. Doc. 111, at 5.) He argued that did not make any "calculation" to influence or retaliate against a government. (R. Doc. 111, at 5.) Based upon those objections, Masood asserted that the correct base offense level was 26 and his criminal history category was I, resulting in a guidelines range was 46 to 57 months' imprisonment. (R. Doc. 111, at 4.)

Masood sought downward departures for overstatement of criminal history, his mental and emotional condition, diminished capacity, and aberrant behavior. (R. Doc. 111, at 10-16 (citing U.S.S.G. § 4A1.3(b) (criminal history), § 5H1.3 (mental and emotional condition), § 5K2.13 (diminished capacity) and § 5K2.20 (aberrant behavior)).) He also argued for a downward variance relying on many

of the same arguments. (R. Doc. 111, at 16-28.) Masood did not recommend a particular sentence.

In arguing for downward departures and/or a variance, Masood contended that his mental health history, the absence of prior criminal history, and a lack of dangerousness warranted leniency. (R. Doc. 111, at 10-24.) He argued that his social and cultural isolation and mental health issues had a substantial influence on his commission of the offense. (R. Doc. 111, at 10-15, 17-18.) In support of his requested departures and variance, Masood recounted findings from the psychological assessments of him conducted while he was in custody. (R. Doc. 111, at 10-15, 17-18.) He argued that treatment and medication demonstrated rehabilitation that mitigated the threat of future dangerousness. (R. Doc. 111, at 18-20.) He also submitted several academic studies regarding the rate of recidivism in terrorism cases, which Masood asserted was very low. (R. Doc. 111, at 20-23; R. Doc. 111-1; R. Doc. 111-2; R. Doc. 111-3.) Further, Masood cited and discussed nine terrorism cases that resulted in sentences of 120 months' imprisonment or less that he argued involved defendants whose conduct was either comparable or more egregious. (R. Doc. 111,

at 24-29.) Finally, he contended that his pre-sentence confinement in county jail and in BOP facilities while institutional COVID restrictions were in place warranted mitigating consideration. (R. Doc. 111, at 27-28.)

### 3. The Parties' Sentencing Replies

The parties each submitted a sentencing reply. (R. Doc. 117 (government's reply); R. Doc. 118 (Masood's reply).) The government argued that the record belied Masood's claim that his conduct did not involve, and was not intended to promote, federal crimes of terrorism; opposed Masood's request for guidelines departures; and cited twelve cases in which similarly-situated terrorism defendants had received statutory-maximum sentences. (R. Doc. 117, at 1-13.) Masood reiterated his arguments in opposition to the terrorism adjustment and in mitigation of sentence. (R. Doc. 118, at 2-16.)

### F. Sentencing Hearing

The district court conducted the sentencing hearing in August 2023. (R. Doc. 126, Minute Entry.) The district court began by noting that it "suspect[ed] Counsel, that you desire to make some arguments with respect to" the "guidelines and variances." (Sent. Tr. 2.) "Preliminarily, before we do that," the court stated that "pursuant to

the Presentence Report, I would find that the total offense level is 35, the criminal history score is VI, and under, that, the imprisonment range is 292 to 365 months". (*Id.*) "Having preliminarily made those comments," the district court invited argument on the disputed guidelines calculations. (Sent. Tr. 3-13.) Masood focused first on the terrorism adjustment, restating his position that he intended to join ISIS to provide medical care "without any discussion of any particular political goals or objectives." (Sent. Tr. 4-5, 7-9.) Masood also noted he had "analyzed the [terrorism adjustment] case law extensively in the briefing" that had been submitted in advance of sentencing. (Sent. Tr. 6-7.) The district court acknowledged its review of those submissions. (*Id.*)

The government emphasized that for the terrorism adjustment to apply, a defendant need not explicitly "say the words [that] specifically match the text of § 3A1.4." (Sent. Tr. 10.) Rather, all words and actions of a defendant may be considered in drawing reasonable inferences about whether the offense was calculated to influence or affect the conduct of government. (Sent. Tr. 10-12.) The government highlighted Masood's statements about "belong[ing] on the

battlefield," "need[ing] weapons training," and "want[ing] to get killed." (Sent. Tr. 10-11.) Masood contemplated lone wolf attacks while "behind enemy lines" in the United States, and then sought to travel to Syria to fight for ISIS on active battlefields. (*Id.*) And although the government agreed he also wanted to use his medical training overseas, it noted that Masood's offer of combat medical support was also centered on assisting ISIS's military operations. (Sent. Tr. 11-12.)

Masood asked for the opportunity to reply to the government, and the district court agreed. (Sent. Tr. 12.) Masood contended that although he did not have to "say the exact words that are in the text of the statute," he has to "make some kind of statements that show that he is trying to pursue" the statutory goals. (*Id.*) He said while there was "unfortunate religious extremist rhetoric going on about battles," there was no discussion of "what the political goals were in any sense." (Sent. Tr. 13.) Masood's interest, he reiterated, "was providing medical care." (*Id.*)

At the close of Masood's reply, the district court called a recess "to review a matter, and then I will anticipate that I will give you a written order with respect to the Court's ruling on the proceedings this

morning." (Sent. Tr. 13-14.) The district court wanted to give the parties an opportunity to review its rulings before turning to sentencing arguments and allocution. (Sent. Tr. 14.) The district court circulated a written order during the recess and took the bench again after about ten minutes. (*Id.*; Masood Add. 1A-7A (Order).)

The district court's Order began by resolving the disputed terrorism adjustment. (Masood Add. 1A-3A.) The court found that Masood attempted to join ISIS knowing it was a terrorist organization; discussed "lone wolf" attacks in the United States; contemplated developing drones for attack purposes; offered to "kill and get killed" for ISIS; and packed military gear and medical supplies to provide support to ISIS. (Masood Add. 2A.) The district court determined by a preponderance of the evidence that "[a]ll of these facts evidence his desire to either fight with ISIS or provide support for ISIS's terrorist activities, not merely provide medical care." (*Id.*) The court concluded that the terrorism adjustment accordingly applied because his conduct was calculated to influence or affect the conduct of government by intimidation or coercion or, alternatively, was intended to promote a federal crime of terrorism. (Masood Add. 1A-3A.)

The court next addressed Masood's departure motions for overstated criminal history, mental and emotional conditions and diminished capacity, and aberrant behavior. (Masood Add. 3A-6A.) The court declined to depart downward on criminal history grounds, concluding that "individuals convicted of certain terrorism offenses are serious offenders for whom an enhanced criminal history score [of Category VI is appropriate." (Masood Add. 3A.) With respect to mental and emotional conditions and diminished capacity, the district court noted Masood's submissions of two psychological assessments prepared on behalf of the defense, and his descriptions of a dysfunctional childhood including abuse by his father and an incident of sexual abuse suffered as a child. (Masood Add. 5A.) The court found that mental health conditions and childhood trauma were not present to the unusual degree required for downward departure under §§ 5H1.3 and 5K2.0. (Masood Add. 5A.) The court noted, however, that it had taken "Masood's mental health and history into account in fashioning the sentence imposed, as 18 U.S.C. § 3553(a) requires." (Masood Add. 5A-6A.) The court also rejected Masood's request for an aberrant behavior departure, noting that it applies if the offense "was

committed without significant planning." (Masood Add. 6A.) The court found Masood had engaged in significant planning to travel to Syria and support ISIS, and this "[h]is conduct was not aberrant behavior within the meaning of the guidelines." (Masood Add. 6A.) Finally, the court observed that Masood was seeking "a variance under § 3553(a), pointing to his mental illness an post-offense rehabilitation, the hardship of his 3-year detention in a county jail, and that he did not pose a danger ot the community." (Masood Add. 6A.) The court noted it had considered those factors and found that they "warrant[] a sentence below the guidelines range, although not the significant reduction Masood seeks." (Masood Add. 6A.)

After circulating the Order, the district court took the bench again. (Sent. Tr. 14.) The district court noted it had overruled Masood's guidelines objections and now adopted the preliminary guidelines findings reviewed at the beginning of the hearing. (*Id.*) It then invited arguments about departures and variances. (*Id.*) Masood asked the district court for permission to cite two cases, not included in his briefing, that he believed were relevant to his argument that applying a criminal history category of VI overstated his criminal

history. (Sent. Tr. 14-15.) He noted that the district court had ruled on that issue in its Order, but wanted to submit them for the record. (*Id.*) The district court agreed, and Masood cited two cases. (Sent. Tr. 16.) The district court then maintained its overruling of Masood's criminal history objection. (Sent. Tr. 15, 17.)

Next, Masood asked if the district court if "the variances [are] still on the table." (Sent. Tr. 17.) The district court confirmed they were. (*Id.*) Turning to dispositional arguments, Masood began by offering oral statements from two members of Masood's family. (*Id.*) Masood's brother, Omar Maqbool, spoke first. (Sent. Tr. at 18-20.) Maqpool said he knew Masood as a kind, non-violent person. (Sent. Tr. 18, 19-20.) He referenced Masood's mental health, divorce, and career struggles as contributing to his "misguided attempt to find meaning and purpose in his life." (Sent. Tr. 19.) He asked the district court to return Masood to society so he could help people with his medical abilities. (Sent. Tr. at 19-20.)

Masood's cousin, Anwar Chahal, spoke second. (Sent. Tr. 22-28.) He emphasized Masood's psychological condition, his divorce, and his isolation from family supports as explanations for his conduct. (Sent.

Tr. 22-26.) Chahal expressed regret that Masood's family had not been aware of Masood's needs and thus had not intervened. (Sent. Tr. 24-26.) He asked the district court to "consider everything holistically" and expressed hope that Masood could still contribute to society in a meaningful way. (Sent. Tr. 27-28.)

Following the family's statements, Masood's counsel argued in mitigation of sentence. (Sent. Tr. 28-39.) Counsel began by reviewing Masood's mental health history, noting he was not in treatment or under medication for his conditions at the time of the offense. (Sent. Tr. 29.) He argued that Masood's effort to assist ISIS were "an act of desperation" resulting from a lack of support, a failed marriage, and professional difficulties. (Sent. Tr. 31-32.) Counsel asserted that the post-arrest mental health diagnoses and subsequent efforts to restore Masood to competence demonstrated that Masood's conduct was the product of "irrational thinking," albeit not rising to a mental illness defense. (Sent. Tr. 32-33.) Counsel offered that Masood had not expressed ISIS sympathies since his arrest and was using medication and therapy to address his mental health. (Sent. Tr. 34-35.)

Further, Masood's attorney contended that Masood was rehabilitated and did not pose a danger to society. (Sent. Tr. 35-37.) In counsel's view, Masood was not committed to extremist ideology and was "not capable of hurting anyone." (*Id.*) He asserted that those who committed terrorism-related crimes had low rates of recidivism according to academic research that he had submitted to the district court in his pre-hearing filings. (Sent. Tr. 36-37.)

Finally, counsel referenced cases he had cited in his position pleadings in which terrorism defendants had received sentences of 40, 48, 76, and 84 months' imprisonment. (Sent. Tr. 38-39.) He argued that the defendants' conduct in those cases was similar to, or more serious than, Masood's. (*Id.*) Counsel suggested that an "extremely substantial downward variance is in order" given mitigating factors offered by the defense. (Sent. Tr. 39.)

Masood then addressed the district court. (Sent. Tr. 40-43.) He expressed regret and remorse for his actions and attributed them to professional and personal difficulties he was experiencing at the time. (Sent. Tr. 40-41.) Recounting therapeutic and treatment strategies undertaken after his arrest to address his mental health, Masood

stated he intended to be a law-abiding and productive member of society upon release. (Sent. Tr. 41-43.)

Following Masood's allocution, the government made brief argument to supplement its written submissions. (Sent. Tr. 43-44.) The government underscored that Masood had embraced extremist ideology before he met the CHS. (*Id.*) Recognizing from the district court's Order that it intended to grant a downward variance, the government asked the district court to not lose sight of deterrence considerations and promoting respect for the law in arriving at its sentence. (Sent. Tr. 44.)

The district court sentenced Masood to 216 months' imprisonment, a downward variance from the 240-month guidelines range. (Sent. Tr. 46-47.) The district court noted that balanced against considerations of mental illness and other mitigating circumstances, Masood had committed a serious terrorism offense that included Masood's pledge to "kill or be killed." (Sent. Tr. 44-45.) The district court observed that terrorism offenses carry substantial penalties not only to allow for specific deterrence, but also for general deterrence. (Sent. Tr. 45.) Sentences in the national security context "give[] notice

to anyone who has the concept of entering into terrorism to be deterred from doing so because of the penalties they will receive." (Sent. Tr. 45.)

The district court turned to reasons for its downward variance. (Sent. Tr. 45-46.) The district court noted that Masood had spent a significant portion of his pretrial confinement in county jail while COVID-related restrictions were in place. (*Id.*) Confinement under those conditions was "pure hard time" that supported mitigation of sentence. (*Id.*) Further, the district court commended Masood for "what [he had] done to during that time to assist himself," reflecting Masood's emphasis on his efforts to address his mental health and complete positive programming while awaiting sentence. (Sent. Tr. 46.) This too, was "part of the reason or the variance." (*Id.*)

The district court next addressed considerations of mental illness. (Sent. Tr. 46.) Acknowledging it was not "learned on the subject," the court recognized that mental illness is "serious," "unfortunate," and "very real." (*Id.*) It was often a factor in criminal cases, and could "too often for too many be [a] crutch." (*Id.*) At bottom, the court observed, it was not punishing mental illness, but rather

arriving at just punishment for the terrorism offense committed by Masood. (*Id.*)

The district court imposed a sentence of 216 months' imprisonment, a downward variance from the 240-month guidelines range, and a five-year term of supervised release. (Sent. Tr. 47.) After its explanation and imposition of sentence, the district court asked the parties if they had anything further. (Sent. Tr. 52.) Both parties stated they had nothing further. (*Id.*)

Following entry of judgment, Masood filed timely notice of appeal. (R. Doc. 130.)

## SUMMARY OF THE ARGUMENT

Masood begins by challenging his sentence on three procedural grounds. First, he claims that the district court improperly calculated the guidelines range because, he contends, it clearly erred in finding that his offense involved, or was intended to promote, a federal crime of terrorism. The district court did not clearly err, because the sentencing record amply demonstrated that Masood's attempt to materially assist ISIS on the frontlines in Syria was itself calculated to influence, affect, or retaliate against governments aligned against the Islamic State or, in the alternative, was intended to promote ISIS's terrorism crimes. For his second and third claims of procedural error, Masood asserts that the district court plainly erred by failing to consider the § 3553(a) factors and by failing to adequately explain its sentence. The claims are meritless, as the district court considered the statutory sentencing factors and adequately explained the reasons for its sentence.

Next, Masood argues that the district court abused its sentencing discretion by imposing what he suggests is a substantially unreasonable sentence. The district court committed no abuse of its

substantial sentencing discretion. The district court appropriately weighed aggravating and mitigating circumstances in concluding that a sentence of 216 months' imprisonment was fair and just. The district court varied downward from the guidelines range of 240 months' imprisonment, and this is not the "nearly inconceivable" case where the district court abused its discretion by not varying downward still further.

Finally, Masood alleges that the district court failed to meaningfully afford him his rights under Federal Rule of Criminal Procedure 32(i) to comment on guidelines disputes and to allocute before imposition of sentence. The district court, however, provided Masood with the opportunity to make arguments in support of his guidelines objections before the court made its final guidelines determinations and with the opportunity to allocute before imposition of sentence. Those procedures fully comported with the requirements of Rule 32(i). The judgment should be affirmed.

# ARGUMENT

## I. The District Court Did Not Procedurally Error In Applying The Terrorism Adjustment, Considering the § 3553(a) Factors, Or Explaining Its Sentence.

### A. The District Court Committed No Clear Error In Applying The Terrorism Adjustment.

#### 1. Standard Of Review

This Court reviews imposition of a sentence, whether inside or outside the guidelines range, under a "deferential abuse-of-discretion standard." *United States v. Isler*, 983 F.3d 335, 341 (8th Cir. 2020) (cleaned up). The review is conducted in two steps, "first reviewing for significant procedural error, and second, if there is no significant procedural error, we review for substantive reasonableness." *Id.* Examples of procedural error include the three alleged by Masood here, namely, improperly calculating the guidelines range, failing to consider the § 3553(a) factors, or failing to adequately explain the chosen sentence. *Id.*; Masood Br. 24 & 25-36 (terrorism adjustment), 24 & 36-52 (§ 3553(a) factors and adequacy of explanation).

This Court reviews for clear error the factual findings underlying application of the § 3A1.4 terrorism adjustment. *See United States v. Ali*, 799 F.3d 1008, 1029 (8th Cir. 2015); *see generally United States v.*

*Boen*, 59 F.4th 983, 996 (8th Cir. 2023). "[S]entencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." *United States v. Dowty*, 37 F.4th 489, 495 (8th Cir. 2022) (cleaned up). Factual findings that "are plausible in light of the record viewed in its entirety . . . must be affirmed, regardless of how [this Court] might have weighed the evidence in the first instance." *United States v. Waller*, 689 F.3d 947, 959 (8th Cir. 2012) (per curiam) (internal quotation omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (internal quotation omitted). This Court reviews the application or interpretation of the guidelines de novo. *Boen*, 59 F.4th at 996.

### 2. The § 3A1.4 Terrorism Adjustment

The § 3A1.4 terrorism adjustment applies if the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. A "federal crime of terrorism," in turn, has the meaning given in 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4 cmt. n.1. Section 2232b(g)(5) provides that a federal crime of terrorism has two requirements: (1) the offense "is

calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (2) the offense is a violation of certain enumerated provisions.

> ### 3. The District Court Committed No Clear Error In Finding That Masood's Offense Involved A Federal Crime Of Terrorism.

> #### a. The District Court's Factual Findings Were Not Clearly Erroneous.

Masood argues that his offense did not involve a federal crime of terrorism because, he claims, it was not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Masood Br. 26-36. Instead, he asserts that "his primary purpose" in joining ISIS in Syria was provision of medical care. Masood Br. 26-27. The claim fails because district court did not err, much less clearly so, in finding by a preponderance of the evidence that Masood's attempt to provide material support to ISIS in Syria was calculated to influence, affect, or retaliate against government conduct. Masood Add. 1A-3A (Order).[2]

---

[2] Masood concedes that the second prong of the federal crime of terrorism definition is satisfied given that his material support offense in violation of 18 U.S.C. § 2339B is among the definition's enumerated

Masood's attempt to provide material support to ISIS was directed against the conduct of governments aligned against ISIS, including, for example, the United States, Great Britain, Syria, and Iraq. The record demonstrates that Masood well knew that ISIS was waging war against governments in an effort to establish an Islamic State in the Middle East. Masood became radicalized by the lectures of al-Awlaki, an Islamic extremist killed by the United States military, and by ISIS propaganda videos and images that celebrated ISIS's military successes in the region. He was well-versed in jihadist goals, including the establishment of an Islamic State, or Caliphate, to replace existing governments in the Middle East. PSR ¶ 8 (noting that "Masood's communications with CHS-1 included references to *khilafah* [ISIS-established caliphate ruled by traditional Islamic authority]"). Indeed, Masood sought to support ISIS in Syria precisely because it stood at the center of ISIS's territorial ambitions. As he told an FBI source, he wanted to travel to "*al-Sham* [present day Syria], Iraq, or *Khurasan* [present day Middle Eastern region from Iran to

---

provisions. *See* Masood Br. 26; 18 U.S.C. § 2332b(g)(5)(B)(i) (including § 2339B among enumerated provisions).

Afghanistan],” because he wanted “to fight on the front line as well as help the wounded brothers.” *Id.* As he became intently focused on supporting ISIS’s military effort to gain control of Syrian territory, he pledged to “kill and get killed” fighting for the Islamic State, solicited weapons training, and offered to help ISIS weaponize drones for attacks on enemy forces. Equipped with a tactical vest, ammunition pouches, black camouflage military fatigues, and medical supplies, Masood set off for Syria to support ISIS in its armed conflict with opposing governmental forces.

Masood’s communications and the propaganda he consumed also referred to governmental enemies of ISIS. Masood, in his conversations with FBI sources, identified ISIS as the “truth” *because* it was being targeted by the “arrows” of the *kuffar*. Given its opposition to ISIS, he considered the United States an “enemy” and contemplated lone-wolf terrorist attacks from within. He wondered if, after traveling to Syria, he would regret “miss[ing] the opportunity of attacking the enemy” when he was “in the middle of it.” Concerned that his effort to fight for ISIS in Syria would draw the attention of the United States government, he studied countersurveillance techniques, worried about

government watchlists, and requested a fake visa to keep his identity "clean" for future travel. And he carried a thumb drive with deleted images that included ISIS's body-count "infographic" celebrating the killing and wounding of forces from Syria, Great Britain, and the United States.

On this record, the district court's finding that Masood's attempt to provide material support to ISIS was calculated to influence, affect, or retaliate against government conduct is amply supported. This Court has emphasized that the requirement "does not focus on the defendant but on his offense, asking whether it was calculated, i.e. planned—for whatever reason or motive—to achieve the stated objective." *United States v. Ali*, 799 F.3d 1008, 1031 (8th Cir. 2015) (internal quotation marks and citation omitted). "[C]alculation is concerned with the object that the actor seeks to achieve through planning or contrivance." *Id.* (internal quotation marks and citation omitted). The object Masood sought to achieve was to provide active support of ISIS in its fight against opposing governments. On this record, then, the district court appropriately applied the adjustment.

### b. Application Of The Terrorism Adjustment Has Been Affirmed In Analogous Circumstances.

Courts have affirmed application of the terrorism adjustment in analogous circumstances. In *United States v. Khweis*, for example, the Eleventh Circuit affirmed application of the terrorism adjustment to Khweis, who was convicted of providing and conspiring to provide material support to ISIS. 2023 WL 4993685 (11th Cir. Aug. 4, 2023) (unpublished).[3] Khweis was living in the United States when he decided to join ISIS. *Id.* at *1. He knew that ISIS was a terrorist organization with a goal of "destroying America," watched ISIS propaganda videos depicting ISIS atrocities, and possessed images of ISIS fighters with guns and bodies covered with dust and blood. *Id.* He sought travel advice from ISIS-affiliated social media accounts, quit his job, and traveled to Syria through third countries. *Id.* Khweis then lived in ISIS safe houses in Syria and Iraq, where he knew ISIS personnel was being trained to attack within the United States and

---

[3] *Khweis* was decided three weeks before Masood's sentencing and was not cited or discussed by the parties or the district court. The opinion refers to ISIS as "ISIL," one of the organization's several names. *Khweis*, 2023 WL 4993685 at *1, n. *.

fight coalition forces opposed to ISIS. *Id*. Khweis did not fight himself, but "provided financial support, ran errands, and cared for wounded [ISIS] fighters." *Id*.

The district court found that Khweis "unquestionably believed" that he was going to be involved in the war in Syria over "the Caliphate." *Id*. at *4. He was aware of how dangerous ISIS was when he traveled to Syria, and he was willing to fight those allied against ISIS. *Id*. The district court determined that Khweis endorsed ISIS's jihadist mission and intended to further its anti-governmental goals, including through his efforts "to care for injured fighters, his financial support of [ISIS] members, his participation in anti-American religious training, and his viewing of military videos 'to get inspired against [ISIS's] enemies.'" *Id*. The Eleventh Circuit concluded that those findings "provided an ample basis to infer Khweis's specific intent" for purposes of the "calculated to influence" prong of the terrorism enhancement. *Id*. at *4. The court emphasized that the requisite intent "can be inferred from circumstantial evidence." *Id*. at *3. Khweis's actions gave rise to a reasonable inference that he knew

of and intended to advance ISIS's anti-governmental purposes. *Id.* at *4. The same is true of Masood.

*United States v. Hassan*, from the Fourth Circuit, is likewise persuasive. 742 F.3d 104 (4th Cir. 2014). In *Hassan*, the Fourth Circuit affirmed the district court's application of the terrorism adjustment against three co-defendants: Hassan, Yaghi, and Sherifi. *Id.* at 148-150. All had been convicted of conspiring to provide material support to Islamic jihadist terrorists operating outside of the United States, an enumerated offense for purposes of the adjustment. *Id.* at 110-12, 148. With respect to the "calculated to influence" determination, the district court found that Hassan, Yaghi, and Sherifi held "a shared view of Islam, including the goal of waging violent jihad in various parts of the world." *Id.* at 149-50. Hassan embraced the views of Anwar al-Awlaki and offered himself as a fighter on jihadist battlefields. *Id.* at 149. He believed that jihad imposed an obligation on Muslims to help fight against NATO forces in Afghanistan or Iraq. *Id.* at 149-50. Yaghi, similarly, had traveled to the Middle East seeking "to engage in violent jihad." *Id.* And Sherifi sought to raise funds to buy farmland abroad from which the

mujahideen could "launch various challenges against military occupation or intervention." *Id.* The Fourth Circuit affirmed the adjustment as to each defendant, concluding that a preponderance of the evidence supported the findings that their offenses were calculated to influence or affect, or retaliate against, governments. *Id.* The adjustment applies equally to Masood, whose conduct shared many of the characteristics discussed in *Hassan*.

### c. Masood Has Not Demonstrated Clear Error.

Masood fails to demonstrate that the district court clearly erred in its findings. Masood Br. 26-36. He first argues that his "primary purpose" was "to provide medical care, not fight." Masood Br. 26-27. The evidence, however, supports the district court's finding that at least one of Masood's purposes was to actively wage war in support of ISIS. Masood repeatedly declared his intention to fight for ISIS once he arrived on Syrian battlefields, including killing and being killed if necessary. His assertion that he was only mouthing the words of a jihadist fighter "to show his commitment so that he would be accepted," Masood Br. 27, was, on this record, appropriately rejected by the district court. Masood Add. A2 ("All of these facts evidence his

desire to either fight with ISIS or provide support for ISIS's terrorist activities, not merely provide medical care."). In any event, whether Masood's intent was to fight for ISIS, advance its goals by rendering combat medical assistance, or some combination of the two, his travel to Syria was calculated to support ISIS's armed conflict against governmental forces. That is enough to apply the enhancement.

Masood argues next that the district court clearly erred because "there was nothing specific ever discussed about affecting the conduct of any government or retaliating against government conduct." Masood Br. 27-30, 34-35. As is summarized above, however, Masood's communications and consumption of ISIS propaganda did include references to governments aligned against the Islamic State. In any event, as the Sixth Circuit has observed "[a] district court need not wait for the defendant to confess a specific intent to influence the government. The court can find this intent based on circumstantial evidence and reasonable inferences from the facts presented." *United States v. Wright*, 747 F.3d 399, 419 (6th Cir. 2014) (Clay, J., controlling opinion as to application of terrorism enhancement to one of the defendants). Just so here, where a preponderance of the evidence, and

more, supported a reasonable inference that Masood's attempt to materially support ISIS was calculated to influence, affect, or retaliate against government conduct.

The cases Masood cites in support of his position are readily distinguishable. Masood Br. 27-30. He cites *United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020), but that case involved starkly different facts. There, the court concluded that opening social media accounts, without more, was not sufficient to impose the terrorism adjustment. *Id.* at 704. The court noted that while Alhaggagi expressed his support for ISIS in conversations about creating the account, he "did not post to the social media accounts, he did not control how those accounts would be used, and his statements contemporaneous to the opening of the accounts demonstrate that he did not know how the accounts would be used." *Id.* at 703. Here, conversely, Masood explicitly sought to travel to Syria to personally fight for ISIS in armed conflict against opposing governmental forces.

Masood's reliance on the *Ramirez* and *Ansberry* cases is similarly misplaced. *Ramirez* centered on the district court's total lack of findings in support of the § 3A1.4 enhancement. The *Ramirez* court

"express[ed] no opinion as to whether the factual proffer and any other record evidence were sufficient for the district court to draw any particular inferences here. Rather, the error is that the district court made no fact findings at all." *United States v. Ramirez*, 16 F.4th 844, 855 (11th Cir. 2021). And in *Ansberry*, a defendant retaliated against what he *subjectively believed* was government conduct, but the district court made no finding about whether the conduct against which the defendant retaliated *objectively constituted* government conduct. *United States v. Ansberry*, 976 F.3d 1108, 1123-29 (10th Cir. 2020). The Tenth Circuit, resolving a purely legal question, held that an objective standard applied and remanded for further fact-finding. *Id.* at 1129 & n.13. It did not hold, as Masood seems to suggest, that planting a bomb in front of a police station would never be calculated to retaliate against government conduct. Masood Br. 29.

Masood also relies upon the district court opinion in *United States v. Jumaev*. 2018 WL 3490886 (D. Colo. 2018) (unpublished), *aff'd on other grounds*, 20 F.4th 518 (10th Cir. 2021) (the terrorism adjustment was not reviewed on appeal). In *Jumaev*, the defendant sent $300 to a friend to whom he owed $500. *Id.* at *1-*3. The

defendant and the friend were Uzbeki, and they had, over time, discussed support for an Uzbeki terrorist organization. *Id.* Jumaev was convicted at trial of giving the $300 to his friend to provide material support to the organization. *Id.* The district court declined to apply the terrorism adjustment under the "unique" facts of that case. *Id.* at *6. It concluded that Jumaev paid his debt knowing that his friend would send the funds to the Uzbeki organization, but that Jumaev did not send the $300 repayment while himself calculating to influence government conduct or intending to promote a federal crime of terrorism. *Id.* at *5-*6. Jumaev, for example, "never had any direct contact with the [Uzbeki organization] and . . . the organization was nearly defunct at that time." *Id.* at *6. Conversely, as summarized above, Masood engaged in significant planning with individuals he believed were ISIS operatives to fight for ISIS. His calculated effort to influence government conduct went well beyond the uniquely limited facts of *Jumaev*.

### 4. In The Alternative, The District Court Committed No Clear Error in Finding That Masood's Offense Was Intended To Promote A Federal Crime Of Terrorism.

Masood, at the last, suggests the district court erred by concluding, as an alternative ground for the terrorism adjustment, that Masood "intended to promote" a federal crime of terrorism, even had his offense not itself "involved" a federal crime of terrorism. Masood Br. 30-34; Masood Add. 1A-3A (Order). There was no error, clear or otherwise. The terrorism adjustment is set forth in the alternative, providing for a 12-level increase if the offense either involved or was intended to promote a federal crime of terrorism. *See* U.S.S.G. § 3A1.4. Even if had his own conduct not "involved" acts calculated to influence government conduct, Masood at minimum intended to promote commission by others in ISIS of federal terrorism offenses. For example, Masood aimed, through is offense conduct, to promote ISIS's commission of murder, kidnapping, or maiming outside the United States in violation of § 956(a). *See, e.g., United States v, Awan*, 607 F. 3d 306, 315 (2d Cir. 2010) (discussing § 956(a) as a federal crime of terrorism for purposes of the "intend to promote" prong of the terrorism adjustment). Masood's pledge to join ISIS

abroad was intended to promote, through things like drone weaponization and combat medical support, the very murder and maiming of opposing government forces that ISIS celebrated in its videos and infographics. Fully immersed in words and images depicting ISIS's use of brutal violence in service of its Caliphate-driven war, Masood well knew, moreover, that the terrorist acts he sought to promote were calculated to influence and retaliate against government conduct.

Masood's assertions to the contrary are not convincing. Masood Br. 31-35. It is true, as Masood notes, that the "intended to promote" alternative must still have a federal crime of terrorism as its object. *Id.*; *Awan*, 607 F.3d at 313-16 (discussing federal crimes of terrorism as the object of § 3A1.4's "intend to promote" prong). As noted above, however, Masood's material support of ISIS was intended, at minimum, to promote commission by his ISIS "brothers" of federal crimes of terrorism—like the killing and maiming of opposing forces abroad to influence the conduct of governments aligned against it. Masood's claim that he could not have intended to promote terrorist crimes because the FBI sources he communicated with did not

themselves intend to commit terrorist acts lacks force. Masood Br. 33-34. It is Masood's intent to promote the commission of federal crimes of terrorism by ISIS operatives in Syria that matters, *Awan*, 607 F.3d at 313-16, regardless of the intention of those he was directly communicating with to personally commit terrorist acts.

The district court, in sum, accurately concluded that the Masood's intended, at minimum, to promote ISIS's federal crimes of terrorism, not merely provide medical care for refugees. Masood Add. 2A. Whether on the ground that Masood's offense involved a federal crime of terrorism, or was intended to promote one, the district court's application of the terrorism adjustment should be affirmed.

**B.    The District Court Did Not Err, Much Less Plainly So, In Considering The § 3553(a) Factors.**

**1.    Standard Of Review And Legal Standards**

This Court generally reviews claims of procedural sentencing error for abuse of discretion. *United States v. McGlothen*, 556 F.3d 698, 702 (8th Cir. 2009) But where, as here, a defendant failed to timely object to an alleged failure to consider the § 3553(a) factors, the claim is forfeited and is reviewed only for plain error. *Id.* Under plain error

review, a "defendant must show: (1) an error, (2) that is plain; and (3) that affects substantial rights." *Id.*

"In determining whether a district court has considered the relevant factors, the context for the appellate court's review is the entire sentencing record, not merely the district court's statements at the hearing." *United States v. Perkins,* 526 F.3d 1107, 1110–11 (8th Cir. 2008). The district court need not explicitly reference the § 3553(a) factors by name. Rather, this Court "presume[s] that district judges know the law and understand their obligation to consider all the § 3553(a) factors." *United States v. Gray,* 533 F.3d 942, 943 (8th Cir. 2008) (cleaned up). "If a district court references some of the considerations contained in § 3553(a), we are ordinarily satisfied that the district court was aware of the entire contents of the relevant statute." *Id.* (cleaned up).

## 2. The District Court Considered The § 3553(a) Factors.

The record demonstrates that the district court considered the § 3553(a) sentencing factors. Before the sentencing hearing, the court received a presentence report that set forth Masood's offense conduct (¶¶ 5-25); his criminal history (¶¶ 45-51); his personal history and

characteristics, including his mental health history (¶¶ 54-103); § 3553(a) factors that may warrant a sentence outside the guidelines range (¶¶ 119-24); and Masood's departure and variance arguments (PSR Add. A.1 – A.9). *See Gray*, 533 F.3d 942 (rejecting a "failure to consider" claim in part because the PSR received by the district court contained extensive information about § 3553(a) factors); *see also, e.g.*, *United States v. Greenwell*, 483 F. App'x 305, 306-07 (8th Cir. 2012) (unpublished) (same); *United States v. Benitez*, 409 F. App'x 38, 40-41 (8th Cir. 2010) (unpublished) (same). The court also had Masood's and the government's sentencing memoranda, which explicitly and exhaustively canvassed § 3553(a) factors. R. Doc. 110, at 22-25; R. Doc. 11, at 16-27; R. Doc. 117, at 11-13; R. Doc. 118, at 13-16; *see, e.g.*, *Greenwell*, 483 F. App'x at 307 (rejecting a "failure to consider" claim in part because the parties' sentencing memoranda addressed the § 3553(a) factors); *Benitez*, 409 F. App'x at 40-41 (same).

The parties, moreover, explicitly addressed and argued § 3553(a) factors at the sentencing hearing. Sent. Tr. 17-44; *see, e.g.*, *Benitez*, 409 F. App'x at 40-41 (noting the parties' arguments at sentencing in rejecting a "failure to consider" claim). At the hearing, the district

court referenced the PSR (Sent. Tr. 2), the "three inches" of sentencing memoranda it had reviewed (Sent. Tr. 15), and engaged with each sides' sentencing arguments (Sent. Tr. 6-7, 13-17, 22, 28, 44-46). *See, e.g.*, *United States v. Barbee*, 44 F.4th 1152, 1156 (8th Cir. 2022) (noting district court's engagement at sentencing in rejecting a "failure to consider" claim). In explaining its sentence, the court discussed the seriousness of the offense, considerations of deterrence, Masood's history and characteristics, and its two reasons for its "variance under the 3553(a) factors." Sent. Tr. 44-46. The district court also issued a written sentencing Order that noted Masood's request for "a variance under § 3553(a), pointing to his mental illness and post-offense rehabilitation, the hardship of his 3-year detention in county jail, and that he does not pose a danger to the community" and stating that it had "considered all of these factors in imposing Masood's sentence." Masood Add. A6. There is, in short, no question that the district court was aware of the § 3553(a) factors and considered them.

Masood cannot demonstrate otherwise. Masood Br. 38-52. Rather, he confirms the district court's awareness and consideration of the § 3553(a) factors, reprising at length the arguments he

presented to the district court in pleadings and during the sentencing hearing. *Id.* In some instances (*e.g.* mental illness, rehabilitation), he concedes the district court considered his arguments, but asserts it did not assign them enough weight. Masood Br. 38-43, 49-50. In others (*e.g.* dangerousness, comparable cases), he claims the district court must not have considered his arguments because they were not orally addressed by the court at the sentencing. Masood Br. 43-48. Neither approach demonstrates error, much less plain error, given that the "entire sentencing record, not merely the district court's statements at the hearing" demonstrate the district court's awareness and consideration of the § 3553(a) factors. *Perkins,* 526 F.3d at 1110–11. Masood's failure to consider claim should accordingly be rejected.

### C. The District Court Did Not Err, Much Less Plainly So, In Explaining Its Sentence.

#### 1. Standard of Review

Where, as here, a defendant fails to timely object to a district court's alleged failure to adequately explain its sentence, the claim is reviewed only for plain error. *United States v. Holmes*, 87 F.4th 910, 915 (8th Cir. 2023) (reviewing adequacy of explanation claim for plain error given the defendant made no objection at sentencing to the

adequacy of explanation). "In explaining the sentence, the district court need only 'set forth enough to satisfy the appellate court that it has considered the parties' arguments and has a reasoned basis for exercising its own legal decision-making authority.'" *United States v. DeMarrias*, 895 F.3d 570, 573 (8th Cir. 2018) (cleaned up). A district court need not go into detail in every case or "mechanically recite" how every factor applies to every aspect of the sentence. *United States v. Robinson*, 516 F.3d 716, 718 (8th Cir. 2008) (cleaned up); *see also United States v. Mees*, 640 F.3d 849, 855 (8th Cir. 2011) (same).

Like with Masood's "failure to consider § 3553(a)" claim addressed above, "[i]n determining whether a district court has adequately explained its reasons for imposing a particular sentence, the context for the appellate court's review is the entire sentencing record, not merely the district court's statements at the hearing." *United States v. Palkowitsch*, 36 F.4th 796, 801 (8th Cir. 2022) (cleaned up). This Court presumes that a sentencing court has considered the arguments presented to it. *See, e.g.*, *United States v. Johnson*, 619 F.3d 910, 922 (8th Cir. 2010). That remains true even where a district court makes no mention of a defendant's argument.

*See id.*; *see also United States v. Torres-Ojeda*, 829 F.3d 1027, 1029-30 (8th Cir. 2016) ("Sometimes a judicial ruling responds to every argument; sometimes it does not; sometimes a judge . . . relies upon context and the parties' prior arguments to make the reasons clear." (cleaned up); *United States v. Black*, 670 F.3d 877, 881 (8th Cir. 2012) ("[N]ot every reasonable argument advanced by a defendant requires a specific rejoinder by the judge."). Finally, "an appellant raising a forfeited objection to the court's statement of reasons confronts a daunting task in convincing a court of appeals that a more detailed explanation would have resulted in a lighter sentence." *United States v. Chavarria-Ortiz*, 828 F.3d 668, 671 (8th Cir. 2016).

### 2. The District Court Adequately Explained Its Sentence.

The district court set forth enough explanation to demonstrate its consideration of the parties' arguments and its reasoned basis for exercising its decision-making authority. First, as summarized above, the district court had an exhaustive sentencing record before it, including the PSR and the parties' multiple rounds of briefing, and the district court is presumed to have considered those materials. In this case, in fact, it expressly referenced the parties' "three inches of

briefing." Sent. Tr. 15. During the hearing, the district court explained that "notwithstanding mental illness, notwithstanding childhood difficulties," Masood had committed a serious terrorism offense. Sent. Tr. 44-45. It noted that substantial penalties assigned by Congress and the Sentencing Commission to terrorism offenses served individual and general deterrence interests. *Id.* at 45. Masood's "haunt[ing]" statements that he would kill and be killed in support of ISIS were recounted by the district court. *Id.* The court also explained two reasons it was varying downward, namely the "hard time" Masood had already done in custody during pandemic restrictions and his rehabilitation efforts, for which the court commended him. Sent. Tr. 46-47. And it discussed considerations of mental illness, noting its seriousness, but also emphasizing it had to be weighed against the offense conduct. Sent. Tr. 46.

Finally, the district court, during its oral pronouncement, referenced the content of its written sentencing Order. Sent. Tr. 44. In that Order, the district court discussed Masood's arguments that his primary purpose in traveling to Syria was to provide medical care; that "the offense was aberrant behavior and . . . was caused by his

significant mental illness"; that he had suffered childhood trauma and sexual abuse as a child; that he had been law-abiding in his life before the offense; that he had engaged in post-offense rehabilitation; that he had served "hard time" in county jail; and that he did not pose a danger to the community. Masood Add. A2-A6. Further, the court noted it had "taken Masood's mental health and history into account in fashioning the sentence imposed" and considered Masood's variance arguments in arriving at a below guidelines sentence. Masood Add. A6. In sum, the explanation provided by the district court, assessed in the context of the entire sentencing record, met and surpassed applicable legal standards.

As with his "failure to consider claim," Masood's attacks on the explanation of sentence allege either that the district court's either did not give his arguments enough weight or did not address them. Masood Br. 38-52. For the reasons noted above, both categories of attacks fail. The record demonstrates that the district court considered Masood's arguments and provided a reasoned basis for its sentence, a downward variance. This Court has not only repeatedly emphasized that the sentencing court is not required to offer a specific rejoinder to

every reasonable argument advanced by a defendant, but has particularly underscored that the sentencing court need not "expressly acknowledge and address comparator cases identified by a defendant in imposing sentence." *Palkowitsch*, 36 F.4th at 801; *cf.* Masood Br. 45-49 (alleging failure to address "comparable cases" Masood argued to the district court). There was no procedural error, here. Nor does Masood even attempt to confront the "daunting task" of convincing this Court that a more fulsome explanation would have resulted in a more lenient sentence. *Chavarria-Ortiz*, 828 F.3d at 671.

## II.    The District Court Did Not Abuse Its Discretion By Sentencing Masood to 216 Months' Imprisonment.

### A.    Standard Of Review

This Court reviews the substantive reasonableness of a sentence for abuse of discretion. *United States v. Burns*, 834 F.3d 887, 890 (8th Cir. 2016). This Court "may find abuse of discretion where the sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but commits clear error of judgment in weighing those factors." *United States v. Bonnell*, 932 F.3d 1080, 1083 (8th Cir. 2019) (cleaned up). The

defendant bears the burden on appeal to establish that, after consideration of the § 3553(a) factors, his sentence is too harsh. *United States v. Bolden*, 596 F.3d 976, 984-85 (8th Cir. 2010).

In reviewing for substantive reasonableness, this Court gives "great deference to the district court." *United States v. Jones*, 701 F.3d 327, 330 (8th Cir. 2012). District courts have "wide latitude" to weigh factors and to assign some factors greater or lesser weight than others. *See, e.g.*, *United States v. Wisecarver*, 911 F.3d 554, 558 (8th Cir. 2018). As a result, "[t]he district court does not abuse its discretion simply because it weighs the relevant § 3553(a) factors differently than the defendant thinks appropriate." *United States v. Skog*, 820 F. App'x 494, 496 (8th Cir. 2020). Nor does the mere fact that the district court could have weighed the sentencing factors differently amount to an abuse of discretion. *See, e.g.*, *United States v. Hall*, 825 F.3d 373, 375 (8th Cir. 2016).

This Court has observed that "it will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." *United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc)

(cleaned up). The fact that an appellate court "'might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.'" *Id.* at 462 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). And where, as here, the sentencing court varied downward, this Court has observed that "it is nearly inconceivable that the court abused its discretion in not varying downward still further." *United States v. Lazarski*, 560 F.3d 731, 733 (8th Cir. 2009); *see also United States v. Anwar*, 880 F.3d 958, 973 (8th Cir. 2018) (same).

### B. The District Court Did Not Abuse Its Sentencing Discretion.

The district court's sentence was amply supported by the record and was not an abuse of discretion. The district court reasonably weighed the circumstances surrounding the offense, Masood's history and characteristics, and considerations of public safety, deterrence, and just punishment. The court appropriately recognized the seriousness of Masood's attempt to provide frontline support to ISIS, a violent terrorist organization engaged in a deadly war with the United States and its allies. Having contemplated lone wolf attacks in the United States and then undertaken significant planning evincing

an intent to kill on behalf of the Islamic State abroad, Masood's offense conduct warranted the substantial sentence imposed. The district court, moreover, not only considered Masood's arguments in mitigation, it accepted a number of them in rejecting the government's sentencing recommendation and varying downward from the guidelines. Under all of the § 3553(a) considerations here, the district court's 216-month sentence was a reasonable exercise of its considerable sentencing discretion, and this is not the "nearly inconceivable" case where a court abused its discretion in not varying downward still further.

Masood has not demonstrated that the district court abused its discretion in arriving at its sentence. Masood Br. 38-52. He relies on the same arguments made in support of his procedural error claims. *Id.* They fail for many of the same reasons. As summarized above, the district court carefully considered and weighed, both orally and in writing, the mitigation arguments Masood pressed in the departure and variance contexts. It gave appropriate consideration to the seriousness of Masood's offense conduct, public safety, and deterrence balanced against Masood's history and characteristics. It explored

Masood's assertions of medical-care motivation, mental illness, aberrant behavior, rehabilitation, and lack of dangerousness across both written and oral sentencing pronouncements. And, in any event, it was not required to address each of Masood's arguments. *See, e.g. United States v. Soliz*, 857 F.3d 781, 783 (8th Cir. 2017) (noting that the "sentencing practices of one district court are not a reference point for other courts," and thus an argument that defendants in other allegedly comparable cases received a shorter sentence "does not demonstrate an abuse of discretion"). The record is replete, in short, with the district court's careful balancing of the sentencing arguments reprised by Masood on appeal, and the district court committed no clear error of judgment in weighing the relevant factors.

At bottom, Masood's substantive reasonableness claim is that the district court weighed § 3553(a) considerations differently than he preferred. The claim founders both on the sentencing record and on applicable legal standards. The district court received voluminous sentencing materials bearing on the § 3553(a) factors, including all of the arguments made here by Masood. The district court is presumed to have considered these arguments and concluded that they did not

call for a lower sentence. *United States v. Wilcox*, 666 F.3d 1154, 1157 (8th Cir. 2012) (rejecting defendant's claim that district court had failed to give proper mitigating weight to his history and characteristics where the district court had received written and oral argument from defendant about his personal history); *United States v. Keating*, 579 F.3d 891, 894 (8th Cir. 2009) (same). This Court has repeatedly emphasized, moreover, that it "afford[s] the court wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. DeMarrias*, 895 F.3d 570, 574 (8th Cir. 2018) (citation omitted). "The sentencing judge is in the best position to find facts and judge their import under § 3553(a) in the individual case." *Wilcox*, 666 F.3d at 1157-58 (internal quotation marks and citations omitted); *see also Gall,* 552 U.S. at 51. The district court made appropriate exercise of its sentencing discretion here, and reversal is not warranted. The judgment should be affirmed.

## III. The District Court Did Not Violate Masood's Rule 32(i) Or Due Process Rights At Sentencing.

### A. Standard Of Review

When a defendant does not object in district court to an alleged failed to abide by the procedures set forth in Federal Rule of Criminal Procedure 32.1(i), this Court reviews the procedural error and due process claims only for plain error. *See United States v. Hentges*, 817 F.3d 1067, 1069-70 (8th Cir. 2016); *see also United States v. Thurmond*, 914 F.3d 612, 614 (8th Cir. 2019); *United States v. Puckett*, 715 F. App'x 578, 579 (8th Cir. 2018) (unpublished); *United States v. Soto*, 779 F.3d 525, 527, 528 (8th Cir. 2015); *United States v. Hoffman*, 707 F.3d 929, 937 (8th Cir. 2013); *United States v. Barrett*, 552 F.3d 724 728 (8th Cir. 2009).

### B. The District Court Did Not Err, Plainly Or Otherwise.

The district court did not err, much less plainly so, in following Rule 32.1(i) procedures. This Court has "said that the failure to give the defendant the right of allocution is clear error that requires a reversal." *United States v. Hernandez-Espinoza*, 890 F.3d 743, 747 (8th Cir. 2018). A defendant's right to allocate is "strictly enforced, but it is not a constitutional right." *Hoffman*, 707 F.3d at 937. But "[t]his

strict rule applies in cases where a defendant never gets a chance to allocate at all." *Hernandez-Espinoza*, 890 F.3d at 747. "Courts are not nearly as strict when a defendant allocates at some point during sentencing if that allocution retains the potential to affect the sentence." *Id.* For example, this Court has "held that a district court does not err when it announces an intended sentence before allocution and then imposes that sentence after allocution." *Id.* (citing *Hentges*, 817 F.3d at 1070)). "The main point," this Court has stated, is that the defendant's "allocution could still have swayed the district court to change its sentence." *Id.*

At sentencing, the district court solicited and received Masood's attorney's comments about the probation officer's determinations and other matters relating to an appropriate sentence. *See* Fed. R. Crim. P. 32(i)(1)(C); Masood Br. 53-55. After making "preliminary" comments about the guidelines range that would apply "pursuant to the Presentence Report," the court "recognize[d] you, [defense counsel], for such comments as you may have with respect to the subject." Sent. Tr. 2-3. Masood's counsel then argued at length about guidelines application, including the terrorism adjustment and the

attempt guideline. Sent. Tr. 3-10. At the close of those comments, counsel stated, "that's what I have on the sentencing guidelines issues, judge." Sent. Tr. 10. The court heard from government counsel and permitted Masood's attorney to reply to the government's arguments. Sent. Tr. 10-13. The court then called a recess to "review a matter" before providing a written order setting forth the court's final guidelines determinations so that the parties could consider those rulings before making their dispositional arguments. Sent. Tr. 13-14. Where, as here, the district court invites comment on guidelines matters before making its final determinations, the district court's procedure fully complies with Rule 32(i)(1)(C). *See, e.g.*, *United States v. Soto*, 779 F. 3d 525, 529 (8th Cir. 2015) (rejecting Rule 32(i) claim where the district court invited the defendant's attorney to comment on the probation officer's guidelines recommendations before sentencing); *Hoffman*, 707 F.3d at 937-38 (rejecting Rule 32(i) claim where the defendant had opportunity to address the report).

Nor did the district court err, much less plainly so, with respect to Masood's right to allocute. *See* Fed. R. Crim. P. 32(i)(4)(A); Masood Br. 55-57. After taking a recess and providing the written Order, the

district court proceeded to receive dispositional arguments and Masood's allocution before imposing sentence. Sent. Tr. 14-44. The district court received the input of Masood's family members, the argument of counsel, and the allocution of Masood himself. Although the district court stated in its Order that it intended to vary downward to a lesser extent than requested by Masood, it did not indicate it had decided on any particular term of imprisonment before allocution. The district court's procedure, then, comported with Rule 32(i). Indeed, this Court has rejected Rule 32(i) claims where district courts made far more specific statements of sentencing intent before allocution. *See, e.g.*, *Hernandez-Espinoza*, 890 F.3d at 747 (rejecting Rule 32(i) claim where the court imposed a fine and accepted payment before inviting the defendant to allocute); *Puckett*, 715 F. App'x 579 (rejecting Rule 32(i) claim where "although the court stated its intention to vary upward before allocution, it allowed Puckett to speak before announcing sentence"); *Hentges*, 817 F.3d at 1070 (rejecting Rule 32(i) and Due Process claims where "[a]lthough the district court did announce its intention to impose a 132-month sentence before granting Hentges his right of allocution, the court did invite Hentges

to speak before the court imposed the sentence"); *Barrett*, 552 F.3d at 728 (rejecting Rule 32(i) claim where after "[i]ndicating its intention to impose a 120-month sentence on Count 1, the district court allowed Barrett an opportunity to speak"); *United States v. Boose*, 403 F.3d 1016, 1017 (8th Cir. 2005) (per curiam) (rejecting Rule 32(i) claim where "[a]lthough the court indicated its intention to impose a 270-month sentence, no sentence was imposed until after giving Mr. Boose the opportunity to speak").

Masood erroneously equates the district court's preliminary comments about guidelines findings and its intention to vary downward to deprivations of Rule 32(i) procedures and Due Process. Masood Br. 52-57. This is not a case like the *Avery* matter relied upon by Masood, where the district court stated before allocution that it would "do whatever we have to do so that Mr. Avery ends up with 120 months." *United States v. Avery*, 807 F. App'x 74, 75 (2d Cir. 2020) (unpublished); Masood Br. 56-57. Neither reviewing preliminary guidelines calculations nor indicating an intent to vary downward, as the district court did here, are the sort of final declarations of implacable sentencing intent that run afoul of the rules. "Indeed," as

the Tenth Circuit has observed, "it is not improper for the court to convey its tentative view on a proper sentence, a disclosure that may assist the defendant in framing a statement." *United States v. Slinkard*, 61 F.4th 1290, 1293 (10th Cir. 2023). The district court afforded the parties that assistance here. Sent. Tr. 14 (providing the written Order on guidelines determinations to "give [the parties] an opportunity to peruse through that so you have some familiarity with it" before allocution). The judgment should be affirmed.

## CONCLUSION

For all the foregoing reasons, the district court's judgment should be affirmed.

Dated: April 24, 2024

ANDREW M. LUGER
United States Attorney

*/s/ David M. Genrich*

By: DAVID M. GENRICH
Assistant U.S. Attorney
Attorney ID No. 0281311
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600
Attorneys for Appellee

## CERTIFICATE OF COMPLIANCE

The undersigned attorney for the United States certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. The brief has 12,793 words, proportionally spaced using Century Schoolbook, 14-point font. The brief was prepared using Microsoft Word 365.


Dated: April 24, 2024                    ANDREW M. LUGER
                                         United States Attorney

                                         */s/ David M. Genrich*

                                         By:  DAVID M. GENRICH
                                         Assistant U.S. Attorney
                                         Attorney ID No. 0281311
                                         600 U.S. Courthouse
                                         300 South Fourth Street
                                         Minneapolis, MN 55415
                                         (612) 664-5600
                                         Attorneys for Appellee